You will excuse as I turn into a witch, because this is a very bad hair day. And I did not prepare, so just close your eyes. I have the same problem, too. Alrighty, the first case of the morning is in the matter of American National CineMedia Debtor and American Multi-Cinema v. Nat, anyway, Consolidated Cases under No. 24-20386. And we will hear first from Mr. Schwartzenreuber. May it please the Court, Michael Schwartzenreuber, counsel for Cinemark, presenting on behalf of both defendants initially. I will address application of the most favored nation's provisions, including the definition of founding members, and my colleague, Mr. Cruciani, will speak for AMC regarding issuance of units under the Common Unit Adjustment Agreement. This appeal concerns a bankruptcy court decision to read out express language of a commercial contract, thereby trampling upon the rights of non-debtors, Cinemark and AMC, in order to confirm the debtor's bankruptcy plan. That was an error, and it requires reversal. The principal issue before the Court is whether, by terminating the Regal Exhibitor Services Agreement, referred to as an ESA, immediately before entering into a new agreement with the same but more favorable terms, that Regal and NCM could avoid application of the most favored nation's provisions in the ESAs of Cinemark and AMC. They could not. The MFNs in each founding member's ESA were written expansively to cover both amendments and new agreements that amended terms, thereby ensuring that each founding member had the opportunity to maintain parity with regard to the respective ESAs they had with NCM. If NCM's reading of the MFN were correct, the MFNs could be rendered meaningless simply by one founding member terminating and then entering virtually immediately into a nearly identical agreement, but with more favorable terms.  Doesn't the fact that they're both in Chapter 11 make a difference about their rights to assume or reject executory contracts?   Well, the fact that they're in Chapter 11, Your Honor, requires — it does affect it, but the debtor in this case, NCM, chose to assume the ESAs with Cinemark and AMC and thereby is required to cure any defects or breaches in order to assume those contracts. Yeah, but Regal was also in Chapter 11. Correct, Your Honor, but we're not challenging anything today with respect to any ruling that was made in the Regal case. The settlement order and the confirmation plan in this case were both the subject of the proceedings before Judge Jones, and nothing was challenged with respect to the proceedings before Judge Isker with regard to Regal. Well, I understand that, but go ahead. So the reading that counsel would — that opposing counsel and the underlying courts gave with respect to the MFN provisions is, A, not supported by the text, and B, no rational party would agree to an MFN that could so easily be circumvented by the simultaneous termination and then entry into a new agreement containing the same but more favorable terms. That undercuts the very idea of an MFN. So today I'd like to talk about two points of error by the bankruptcy court in ruling that the Regal Network Affiliate Transaction Agreement, or NATA, did not trigger the most favored nation clauses of the Cinemark and AMC ESAs. First, the bankruptcy and district courts erred by disregarding specific language in the ESAs dictating what types of contract changes would trigger the MFNs, and second, both courts below erred by disregarding the definition of the key term founding members in the ESAs and using a different definition from a different contract in plain contravention of the clear integration clause that was contained in each of the ESAs at issue. The MFN contract language is our starting point here today, and I want to direct the court to that language. It's found at the Record on Appeal 15082, and it reads that NCM shall promptly provide to Cinemark or AMC as applicable a copy of each agreement, amendment, or extension as may be entered into by NCM on or after the original effective date with each founding member which amends any term of the Exhibitor Services Agreement into which any of the founding members has entered. And then at that point in time, there's some intermediate language, and you skip down to what rights that triggers. At that point, Cinemark or AMC then has the expressibility to conform its ESA, and I quote, in part or in whole to any one of such agreements or amendments. So there are four elements to triggering the MFN, two of which are undisputed. One is that there be an agreement or amendment. There is no dispute that the NADA is an agreement. The second is that it be entered into after the effective date of the ESAs.  No, when you said there's no dispute, it does seem to me that the dispute brought into by David Jones was that the agreement, amendment, or extension must amend the original agreement, and that, just back to the argument that you're making, but isn't that the operative language?  I think we're not in agreement that the agreement amends. The issue becomes a two-fold issue, I believe, if I'm understanding the Court's question. This is the way we would perceive it. There was a ruling below that there was no amendment of the ESA because the ESA had been terminated. They've cited rather unremarkable case law in the shareholder representative case simply finding that when they determined that something was an amendment as opposed to an agreement, they noted that in the context of an amendment, the agreement must still exist, an unremarkable position. There's not an issue here. The amendment issue is not what's before the Court today. The language that is before the Court today is an agreement that amends the terms. And the operative ruling there was— What's the distinction you just made? I don't understand what you mean by the amendment is not before the Court today. The operative language is there can be either an amendment or an agreement, and both must amend the terms of the ESAs. Oh, I see what you mean. And so an amendment leaves in place the prior agreement. Are you just saying that factually is not before the Court? That's not before the Court. What is before the Court is whether the NADA was an agreement that amended the terms of the prior existing ESAs. And the arguments below and the argument I think you'll hear from counsel is that when an agreement is terminated, its terms are likewise terminated, and there's nothing left to be amended into a new agreement. But respectfully, that's the whole purpose of a new agreement. That's why the Court—or why the parties put into their contract not just an amendment that changes the terms, but a new agreement that amends those terms. What is your best Delaware law, if that's what we're looking at, to say that your interpretation of this should be upheld by the Court, accepted by the Court? I believe, Your Honor, the best cases are going to be the Osborne v. Kemp case that says, under general principles of—this is quoting the Sonitrol Delaware Supreme Court—under general principles of contract law, a contract should be interpreted in such a way as not to render any of its provisions illusory or meaningless. They go on then to discuss that the contract interpretation must be reasonable, and under that they say at footnote, page 1160, pardon me, an unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract. Here, what we would argue is, if agreement—excuse me, if amendment to amend terms means the same thing as agreement to amend terms, that reads any meaning out of the parties' expansive language saying that an agreement to amend terms was effective in order to trigger the MFNs. And what we have here is a circumstance where they say, we terminated the agreement, and therefore, there can have been no agreement to amend the terms. The terms no longer existed. Was the agreement, the termination agreement, what the parties call the TSA, was that an agreement to amend terms? That was an agreement to do two things, Your Honor. It both terminated the agreement and then immediately following that, entered into a new agreement that did in fact amend those terms. So I'm looking at what the parties call the TSA that appears at roughly 16500 of the Record on Appeal. There's nothing in the not about the nada in here, in this agreement, right? I realize that they're very close in time, but they're not the same agreement, correct? That's correct. So did your client, did Cinemark, want the benefit of the TSA? I understand you want the benefit of the nada. Did you want the benefit of the TSA? Did you think that you were entitled to it under the MFN? Sorry for the acronyms. It sounds like we're in Washington, D.C., but you understand what I mean. I do understand what you mean. The TSA did not actually effectuate the existence of a new agreement amending the terms. The TSA, in a sense, did, right? The TSA amended the what I forget what the duration date was, but the expiration date of the ESA that you had within NCM was what, 2037? That effectively amends that term, right? And then some others, but it So the most direct answer to that is whether they wanted it or not, I can't speak to, but the way the language reads, if the new agreement amends any term, then it must be provided to Cinemark and AMC so that they have the opportunity to determine whether they want to adopt that term. That was not done with respect to the TSA or the settlement agreement. Did your client want the benefit of the TSA? I can't speak to that, Your Honor, because what I do know is they wanted the benefit of the nada, and since that unequivocally, whether it did it later or not, amended terms. It contains the same terms, covers beverage services, it covers payments, it covers advertising services, and those are terms, even if the agreement was legally terminated, the ESA, those are terms that exist, and we can look at them, and they're still legally operative for determining the effect of the MFN, even if they're not legally operative as between NCM and Regal any longer. I take your brief to be arguing that you feel like you're stuck in this joint venture, and I guess what I'm asking is why you wouldn't be able to invoke your rights and sue them for not giving you the benefit of the TSA, right? The TSA was a way out, and then you could have negotiated on these regional services agreements the same way they did, arm's length, and figured out if you liked that deal better. And I would agree that may well be a possibility. The direct legal error in the ruling that we believe is in error and that deprived them of their rights here, however, is the ruling approving the settlement agreement and allowing the assumption of the ESAs without, and specifically finding at the request of NCM that those did not, this settlement agreement between the owner and another party did not trigger the contract rights of others. We believe that's error. We believe that should be reversed, and we believe this Court can simply vacate that portion of the ruling, finding that the MFNs were not triggered, and in turn determine that the MFNs were triggered by the NADA. Don't your clients still own part of NCM? They do. I don't understand the economics of this argument, but maybe your colleague can explain it in terms of the units. Thank you. May it please the Court, John Cruciani appearing for AMC. As my colleague mentioned, I'll be addressing the common units issue in these appeals. As noted on our briefs, this common unit issue is an issue only for AMC, not CentiMark. NMC should have required, should have been required to issue and allow for redemption of the common units in order to assume both the CUAA and the LLC agreement. This issue falls squarely within the confines of Section 365 of the Bankruptcy Code. Well, let me, number one, what would you have gotten? Isn't that essentially an equity position? Yes, Your Honor. And equity is the lowest on the scale in bankruptcy. So, number one, I don't understand that. And number two, the timeline that's provided in your own contract seems to suggest, although the debtor may have pulled a fast one, it was a fast one that was precisely within the terms of the contract. Your Honor, the first one, what would we, your first question, what would we have received? We would have received the common units, which were ultimately issued on the effective date and then immediately canceled three hours later. But those common units come with, under the LLC agreement, an absolute right by the member, in this case AMC, to redeem those units for units in the debtor's parent company, NCMI, which is a publicly traded company. So they have monetary, significant monetary value. That's what the redemption agreement provisions in the LLC agreement provide for either the issuance upon redemption of units, or pardon me, shares in NCMI or cash. In terms of, as an example, you know, today those units are worth approximately $9 million, the shares in NCMI attributable to the amount that AMC should have received. And, Your Honor, in terms of the timeline, the issue there is the LLC agreement had requirements that required that NCM redeem those units. And they assumed that agreement without complying with all the terms and provisions of the LLC agreement. And so they essentially extinguished our redemption rights, even though they assumed the LLC agreement. Your Honor, we will admit that under a normal plan it's common for equity in a debtor to be wiped out. We readily admit that. But the converse is true in this situation. If there's an agreement or agreements that require redemption of the equity, it has to be honored if they want to assume that agreement. They didn't reject it. They assumed it. But they only assumed it in part because they did not honor our redemption rights. Your Honor, we think several cases, and I see I just have a few minutes here, are important here. The National Gibson case, a Fifth Circuit case, essentially said that a discharge of a general unsecured claim can't obviate or nullify a cure obligation. That's analogous here. What they're trying to do is say the equity was wiped out and eliminated under the plan, which as a general rule is fine. But they can't do that and assume the LLC agreement and not recognize and honor our redemption rights. We also, Your Honor, believe, Your Honors believe the Thornhill case is right on point. It simply stands for the proposition that a debtor can't use Section 365 to create a different deal than the one it had originally. That's what NCM is trying to do. They're trying to assume both of these agreements, but not honor the redemption right that's contained in the LLC agreement that's mandatory. Well, Counsel, obviously the way this preceded district court, bankruptcy court, is that timing undermines your argument, that you had the rights fully recognized, but you needed more time in order to get the exercise of those rights. And before there was any obligation to allow you to exercise them, the equity was canceled. I mean, I don't know what case law you would have one way or another on that, but it does seem to me, in fact, it was only ten days, whatever's left of the ten days. It could have been two years. And the argument you're making would seem to apply no matter how long that time frame was, and it starts to get pretty attenuated if it's a long period of time that you would have these rights to exercise. Do you have any response to my sense that your only reason your argument seems to have a little purchase is that the timeline was so short? Well, what if the timeline had been two years? What would you say to that? Your Honor, in all honesty, Your Honor, I think the timeline's a bit of a red herring because the debtor drafted the plan in such a way to issue the units on the effective date and then immediately cancel them, and that was in contravention of the express time requirements in the LLC agreement. It was within NCM's control on when they were going to issue the units and when they were going to cancel them, and they structured their plan in a way to pull the rug out from AMC from a timing standpoint. But in order to assume those agreements, they have to provide for a full cure, and their plan didn't do that. It's no different. Go ahead. It's no different than arguing that unsecured creditors are discharged in a bankruptcy, and the unsecured creditors were discharged in this bankruptcy at about two cents on the dollar, but with respect to the ESAs, they had to pay our unsecured claims of $2.6 million for AMC and $5.6 million for Cinemark in full, notwithstanding those provisions. But they didn't honor that same concept as specified in National GYPSUM with respect to our equity interests. Suppose they had assumed a contract and canceled one day or two days later, but within the ten days. Am I missing something there? Well, Your Honor, the contract, if I understand your question, Your Honor, the contracts were never canceled. They were assumed. The timing was just when the units were supposed to be issued, and again, that was within the control of NCM, and they could have controlled it. They specifically drafted their plan to try to negate or extinguish that right, even though they were assuming the contracts. It seems to me that we are extending you beyond your time, and our president can deal with that for the other side, but it does seem to me that these rights could have existed when I talk about how little time was left as being operative. It could also be you had not just been transferred this interest. It doesn't work all that well because you would have been sitting on your rights, but it seems to me that there could be rights in ownership that have not been exercised. All of those are canceled on the bankruptcy plan, whatever those may have been. So there's nothing unusual about that. The facts of this show pretty direct harm to your client, but nonetheless, there's nothing that's standard, that whatever those rights may have been, all go when the interest is canceled. Your Honor, I totally agree with that proposition. Other than the LLC agreement had a redemption right, a mandatory redemption right, and it was assumed the debtor chose to assume that agreement, and they have to assume the agreement lock, stock, and barrel. They can't assume a portion of it, and they assumed it, but they didn't honor the redemption rights. Well, what am I quoting from here? AMC could exercise its redemption right, quote, not less than three business days, nor more than ten business days after delivery of the redemption notice. Yes, Your Honor, that's from the LLC agreement. And that right was eliminated by virtue of NCM canceling the common units. And they can't cancel the common units and assume that agreement, because then they're not curing the requirement for us to have the right to . . . Cure is only an event of a default. There hadn't been a default. They create . . . you can argue they create a default, but you don't have to cure unless there's been a previous default. But they have to honor the contract as written once it's assumed, and if they . . . Well, I think it's sort of a matter of timing. I mean, that's . . . But we don't get the full benefit of our bargain if they assume the LLC agreement and they write out or excise . . . I'm so old, I was in the Continental bankruptcy case when Continental, for the first time, canceled its union contracts at the date that it filed bankruptcy. And the unions were pretty upset with that, but it was eventually upheld as something they were entitled to do. And I see your point with Continental, Your Honor, but this is a unique situation in that normally equity is wiped out in a bankruptcy, but they made the decision to assume an LLC agreement that had redemption rights that were rights that were material, financially important and material rights for AMC that they did not honor, even though they assumed the agreement. They did not assume the entirety of the LLC agreement in contravention of Section 365. I have one other question. Because you don't . . . you didn't get this redemption, which translated into stock of NCMI. Who runs NCMI now? Your Honor, pursuant to the plan . . . Joint venture, right? My understanding, Your Honor, pursuant to the plan, is that in general terms, the pre-petition lender group owns about 86 percent of NCMI, or 86 percent of the debtor, and the existing owners at the time of the petition are now NCMI, have the other 14 percent. So NCM, the debtor, is owned about 86 percent by its pre-petition lenders and 14 percent by NCMI. And it's the majority shareholder. So, but NCM is the majority shareholder in NCMI, right? No, Your Honor. NCM is a subsidiary . . .  . . . of NCMI. Right. But I thought that was . . . I thought that you all ended up with certain shares of NCMI when you created the holding company. We did, and those were monetized over the years, Your Honor. So what are your percentage shares in NCMI at this point? Your Honor, AMC doesn't presently have any shares in NCMI. The only shares that we would be entitled to would be the units with respect to the common unit adjustment that was eviscerated as a part of this plan. So it's just a publicly held company? Who runs it? It is a publicly held company, Your Honor, and the debtor, frankly, may be in a better position to disclose who runs it now, but it's a publicly traded company, NCMI is. But you're still in the joint venture in NCM? Well, Your Honor, we're party to the LLC agreement of NCM. We're party to the common unit adjustment agreement, and we're still a party to the ESA. Okay. All right. I guess I understand. Thank you. Thank you for your time. Okay. Mr. Shem again. Thank you, Judge Jones. With the Court's leave, I will focus primarily on the first issue, but of course I'm happy to answer the Court's questions on any aspect of the case. I want to start with our interpretation of the MFN clauses. By their plain terms, the MFN clauses are triggered only by an, quote, agreement, amendment, or extension, which amends any term of the ESA. And so the core of our submission is that an amendment is still required and that the new agreement between Regal and NCM did not amend and could not have amended any of the terms of the preexisting agreement for the simple reason that the preexisting agreement had ceased to exist. We obviously rely on the shareholder representative services case for that proposition, which is consistent with the ordinary understanding of the terms. Now, if I understand Mr. Swartzendruber's argument correctly this morning, he relies primarily on the Osborne case and other authorities for the similarly familiar principle that a party should avoid superfluity or absurdity in the interpretation of a contract. There is no superfluity from our interpretation of the contract, because our interpretation does give meaning to the initial terms on which Mr. Swartzendruber relied, agreement, amendment, or extension. Under our interpretation, those terms simply refer to the form of a contract, one of which is the amendment of a prior agreement. But whatever form the agreement that amends takes, it still has to amend. And so in our view, that takes care of any concern regarding superfluity. Now, the other side comes up with a series of horribles, the primary one of which I think is the notion that parties could simply terminate an existing agreement and enter into a new agreement, which is materially or virtually materially identical. Now, I would note parenthetically that one important limitation on parties doing that is that Delaware, like any other jurisdiction, has an implied duty of good faith and fair dealing. And I think if parties were cruelly attempting to manipulate their way around the MFN clause, that would take care of this. I would cite among other cases the Connolly case from the Delaware Supreme Court, which states that fundamental principle. Note that the lower court here made findings that there was no bad faith here, and quite to the contrary, what my client was trying to do was simply deal with a difficult situation, which was that, as Judge Jones noted, Regal had gone into bankruptcy. Regal therefore had the ability to reject the ESA altogether. That would have been a disastrous outcome for my client, given how significant Regal is as a player in the movie theater market. And so my party then commenced negotiations with Regal to try to enter into a new and very different kind of agreement. And after a mediation before Judge Lopez, what you saw was the NADA, which came out of all of this. Now, I do want to underscore one thing. If you read the reply brief on the other side, they describe this as a nominally distinct contract. I would invite the Court to take a closer look at the two relevant agreements. First, the ESA, which itself had previously been amended, which is at 14924, and the NADA, which is at 15329. Why are these agreements so fundamentally different? Well, Regal was getting out of the joint venture entirely. If you take a look at the TSA, not the agency that checks us at the airport, but the termination agreement, which is at 16541, it's clear that Regal was terminating not just the ESA, but in fact 12 different agreements. And what Regal was doing was entering into the sort of contract that NMC has with a lot of other movie theater chains, which is a sort of pay-as-you-go contract. The joint venture was a true joint venture. There were ownership interests, and there were upfront payments, and the common units were adjusted periodically, depending on essentially the number of eyeballs that each movie theater chain had. By contrast, the NADA was a revenue-sharing arrangement. It had a much shorter term. The revenue-sharing had minimum guaranteed payments, and there were a variety of different substantive terms as well, substantive terms that really mattered, such as the exclusivity of advertising in theater lobbies. Under the NADA, NCM did not have exclusive rights to do that at Regal Theaters, whereas it did under the joint venture. But if you juxtapose those two agreements, you will see that the lower courts got it right when they said that those agreements were fundamentally or radically different. And I would submit that one problem with the other side's interpretation is it doesn't seem to have any stopping point. Their view seems to be that any agreement between NCM and one of the original participants of the joint venture would constitute a triggering amendment. And that would actually— Mr. Chaim, again, let's stop just shy of that. So not any agreement, but an agreement to amend the ESA. Why is the TSA not an amendment, an agreement or an amendment that amends the ESA, which would then trigger the Most Favored Nation Clause? Sure. So, Judge Holden, I was going to get to that. And you've pointed to the TSA, which is at 16, 541. And as the title suggests, what the TSA does is, among other things, terminate the ESA along with all of the other agreements. Now, this is not an argument that the other side has made, but I think I would take the position that a termination is not a mere amendment. A mere amendment is a change to the terms. Here, the underlying agreement is being eliminated entirely. But isn't it true that the ESAs with the three theater chains had termination provisions in them? Right? I mean, there were ways that these could be terminated. Obviously, it would require your client's consent. There are other requirements in there as well. And so, in a way, the TSA is amending the termination agreement. It's also, in some ways, amending the date, the 2037 date, from, you know, whatever, 2037 to today. Right? So, it's amending material terms. And then it adds other stuff. But, I mean, it is amending, in some ways, things that were contractually obligated between your client and Regal. Yeah. I suppose that you could make that argument. I think one thing that might cut slightly against that is the specific reference to an extension in the MFN provision. But I think the broader point is that, at most, if that were correct, what it would mean is that for purposes of the MFN clauses, that AMC and Cinemark could come in and say, we want to terminate two. And, of course, they didn't do that. In other words, the sole thing that they tried to do in the bankruptcy proceeding was to say, we get the benefit of what we view as some of the more favorable terms here. And I think what's intensely problematic about that, Judge Oldham, is that the whole reason that there was this more favorable revenue sharing arrangement going forward is that this was a NADA. This was not a joint venture agreement. If you're in the joint venture, you get the benefit of the upfront payments. You get the benefit of the ownership shares. And so, essentially, what AMC and Cinemark was trying to do was to get the windfall of the more favorable aspects of the NADA as well. So, again — Yeah. That all makes perfect sense to me. I guess their response is going to be, well, the reason that we didn't invoke our rights under the MFN clause to terminate and to get the benefit of the TSA is because it wasn't provided to us by NCM in accordance with the MFN, right? So the MFN says you have to give it to them with a red line or whatever. Query how the red line would work in the circumstance because you're not really redlining the ESA. It's a sort of stand-alone separate document. But there is a provision that says, like, you should have given it to them. Yeah. And if they made this argument before the bankruptcy court, then perhaps that would have all happened if the bankruptcy court had accepted the interpretation. And I do think, again, I would be happy to stand on the ground that I think a termination is different in kind from an amendment. But, again, that was really not the argument they were making below. And I think that the fundamental problem with the argument that they're making now is if this is not sufficiently different, it's far from clear what would be in terms of a new agreement. And so, you know, and again, in terms of the economics of this, I do want to underscore just a couple of things. You know, first of all, I want to make sure that the court is aware of the fact that the bankruptcy court did make a finding at 15586 that NCM wouldn't have entered into this new agreement with Regal if it had triggered the MFN clauses because of the risk of liquidation. This would have had disastrous financial consequences for NCM if it had to make that available to the other two movie theater operators as well. And so, you know, again, we're content to sort of rest on the plain language of the division here. We also have our argument concerning founding member, and I think all I would say about that is in some sense it's just the flip side of our argument concerning the MFN clauses. As a practical matter, Regal was exiting the joint venture entirely, and if you treat all of these contracts as integrated, and there seems to be no disagreement about that, Regal really ceased to be a member at the point of termination. I think with regard to the common units, I think the only thing I would say about that is I would just underscore the fact that what we're really talking about here is two entirely discrete obligations. In fact, they're so discrete that they are, in fact, in two distinct agreements. Under the common units agreement, the CUAA, our sole obligation was to provide AMC with a determination notice periodically of any adjustments in the common units and then issue any additional units 10 business days thereafter. It was the latter part on which we had a default by virtue of the bankruptcy, and we cured that default by issuing those units on or potentially after the effective date. That's all that Section 365 requires. In fact, the plan proposed that we would do so on the effective date. What AMC is really complaining about is the fact that they were unable to exercise their redemption right, a right that is contained under the separate LLC agreement, and that is the provision that requires written notice and a date of redemption, as Judge Jones said, not less than three business days later. The reason they were not able to exercise that right has nothing to do with the cure of our default. It was simply by virtue of the fact that unsurprisingly, as is typical in a bankruptcy of this variety, the plan contained a provision that existed all existing equity. That's the provision at 15549. And so really this is just a complaint about the fact that they were unable to exercise that right and therefore get their hands on the equity by virtue of the timing of all of this. And I think our submission would be that, again, what AMC is essentially seeking is a windfall. They are seeking differential treatment of that equity from all of the other equity that was extinguished in the bankruptcy proceedings. Cinemark does not join that argument. AMC, I think, in making that argument really conflates these two contractual rights. And I think the best evidence that this is not the right way to construe all of this is that I think it was quite clear in the bankruptcy that any subsequently issued units would continue to operate in the normal way. We, of course, assumed our rights under the CUAA once we secured the default. And so, again, to the extent that the concern here is about the extinguishing of this particular equity, that was just as a result of the confirmation of the plan and the ordinary operation of the plan. Unless the Court has any further questions, we would ask that the judgment of the District Court be affirmed. You're essentially representing the secured creditors at this point in time? Well, I don't think so. We're here representing NCM. But as my friend, Mr. Cresciani, said, I think he accurately described the reality of the ownership in NCM, Inc. And I think the only thing I would add, which Mr. Cresciani rightly pointed out, is that AMC and Cinemark, of course, you know, do continue to operate under the common unit arrangement. But those common units are common units in NCM itself. And so, you know, NCM, Inc. is a publicly traded company. And certainly the lenders own, I believe, a majority of those shares. But don't, I mean, at this point in time, Cinemark and the other company, AMC, don't they both own shares in NCM, I, by virtue of previous unit agreements? Or were there, were none of those converted? I'm uncertain as to their ownership. I think by virtue of the fact that, as Mr. Cresciani says, I think they have monetized those shares. And so I don't actually know what their current ownership percentages are of NCM, Incorporated. Okay. Great. Thank you. Thank you, Your Honors. May it please the Court. A couple of points with respect to the MFNs and the TSAs. First, you heard a lot of comment from Mr. Shanmugam about good faith versus bad faith. There's been no allegation of bad faith here. We are making a purely textual argument, the textual argument of which is that an amendment to amend terms and agreement, and an agreement to amend terms cannot mean the same thing. And if... Let me ask you a practical question, which he raised, which is part of the discussion. At the time, coming out of COVID, NCM is in Chapter 11, Regal is in Chapter 11. The people are not going back to the movie theaters. What would have happened if the whole joint venture had fallen apart? Well, if the whole joint venture had fallen apart, then presumably there would have been a different set of issues that would have either triggered or not triggered the MFN provisions of one member or the other, or that wouldn't have. So I'm saying that on the whole, CentiMark and AMC found it more prudent to stay in a joint venture than to have the whole thing fall apart when Regal filed. That's correct. And that goes to, if I might, Your Honor, I think that goes to a core point that Mr. Shanmugam has made and that the Court asked a question, which is whether CentiMark still has ownership interests. And we would submit that in these instances, the ESAs govern one thing and one thing alone. They have nothing to do with ownership. They don't reference anything about ownership. They're ESAs with NCM, a joint venture. That's right. And they're fully integrated agreements that have only to do with the provision of advertising services and the payment of advertising services. I understand that. But the question I asked you at the beginning, and maybe this is a real dumb question and I'll give you a little more time to make your points, but when NCM has filed Chapter 11 and Regal has filed Chapter 11, the easiest thing might have been just to stop the joint venture and everybody be on their own with advertisers. But of course that didn't make business sense, did it? It did not make sense. Okay. And so but what ended up happening is when counsel says they didn't go through the pain of bankruptcy, they didn't give up all of these things, they didn't do all of these things, none of those facts changes the context or the actual text of Except for the practical reality that your two companies are really on both sides of the deal. But at the end of the day, textually, knowing that someone could go bankrupt someday, they all negotiated identical ESAs with identical MFN provisions that were calculated to protect their maintaining equal, the ability to have equal economics in their joint venture. And if one decided to have a new agreement, even after a termination, that amended terms, the terms are still operative for looking at whether or not the new agreement took those terms and amended them. It did. They say it's a completely different agreement. But if you look, it only has to amend any particular term. And you can look. The beverage of Regal in the new agreement, in the NADA, the way payments flowed made the payment structure, including a guaranteed minimum payment for advertising services, better for Regal. As a matter of textual interpretation, an agreement to amend the terms, any term gave Cinemark and AMC the opportunity to look at and determine whether it wanted to adopt that amended term. They were not afforded that opportunity. And textually, the rest of their getting out of the joint venture, their changing other agreements, their having those canceled by virtue of Regal's own bankruptcy, that does not change the text of the way the MFNs work. And we would respectfully submit that the Court should reverse and vacate the portion of the judgment finding that the MFNs did not apply and find that they did. Okay. Okay. Thank you so much. Thank you so much for your time, Your Honors. Thank you.